## 23-13966-D

# United States Court of Appeals
### *for the*
# Eleventh Circuit

———————————

MANAGED CARE ADVISORY GROUP, LLC,

*Plaintiff/Appellant,*

— v. —

CIGNA HEALTHCARE, INC.,

*Defendant/Appellee.*

—————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 1:00-md-0134-FAM
(Hon. Federico A. Moreno)

## BRIEF OF APPELLANT

JEFFREY GUTCHESS
*Counsel of Record*
JOSHUA A. SHORE
AXS Law Group, PLLC
121 NW 2nd Ave., Suite 201
Miami, FL 33127
(305) 297-1878

ANDREW H. SELESNICK
VANESSA LEFORT
Buchalter
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017
(213) 891-0700
*Counsel for Plaintiff/Appellant*

CP COUNSEL PRESS    (800) 4-APPEAL • (JOB 810168)

Managed Care Advisory Group, L v. CIGNA Healthcare, Inc., 23-13966-D

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Appellant certifies that the following persons and entities may have an interest

in this case:

1. AXS Law Group, PLLC

2. Beaulieu, Andrew

3. Brenner, Justin

4. Buchalter

5. Burke, Maura L.

6. Cartsensen, Elizabeth

7. Cigna Corporation [Ticker: CI]

8. Cigna Healthcare, Inc.

9. Cigna Healthcare Holdings, Inc.

10. Cigna Holdings, Inc.

11. Carolan, Jacqueline M.

12. Coffey Burlington

13. Connecticut General Corporation

14. Cunningham, Tim

15. Davis Wright Tremaine LLP

16. DeMaria, Joseph A.

17. Document Technologies, LLC, dba DTI

Managed Care Advisory Group, L v. CIGNA Healthcare, Inc., 23-13966-D

18. Epiq Class Action & Claims Solutions, Inc.

19. Epiq Systems, Inc.

20. Falbo, Mary

21. Fox Rothschild LLP

22. Funes, Freddy

23. Garcia, David

24. Gelber, Dan S.

25. Gelber Schachter & Greenberg, P.A.

26. Goodman, Jonathan (Magistrate Judge)

27. Greenberg, Gerald E.

28. Gunster Yoakley & Stewart, PA

29. Gutchess, Jeffrey W.

30. Hanzman, Michael A.

31. Hogan Lovells US LLP

32.Hooks, Geoffrey

33. IMEDECS

34. Kapila, Soneet (Special Master)

35. Kono, Kevin H.

36. Kozyak Tropin & Throckmorton LLP

37. Managed Care Advisory Group, LLC

Managed Care Advisory Group, L v. CIGNA Healthcare, Inc., 23-13966-D

38. Manning, Neil

39. Matthews, Joseph (Special Master)

40. McEnvoy, Todd

41. McQuilkin, Gail A.

42. Medina, Damaris L.

43. Millennium Healthcare Consulting, Inc.

44. Moreno, Federico A. (Judge)

45. Newell, Robert D.

46. O'Sullivan, John (Magistrate Judge)

47. Pennie, Alejandra Hernandez

48. Perry, Douglas

49. Podhurst, Aaron S.

50. Podhurst Orseck, P.A.

51. Reiling, Jarred L.

52. Schmidt, Timothy

53. Schultz, Thomas G. (Arbitrator)

54. Schwiep, Paul J.

55. Selesnick, Andrew H.

56. Shore, Joshua

57. Steinberg, Martin

Managed Care Advisory Group, L v. CIGNA Healthcare, Inc., 23-13966-D

58. Tropin, Harley S.

59. Walker, Kenneth

60. Weiss Serota Helfman Cole & Bierman, PL

61. Yenni and Company, Inc.

## STATEMENT REGARDING ORAL ARGUMENT

Managed Care Advisory Group, LLC respectfully requests oral argument to aid the Court's understanding of the factual and procedural history of the postjudgment proceedings—including the course of a 15-year arbitral proceeding—stemming from a multidistrict class action litigation that commenced in April 2000 and has already spawned several appeals.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT....................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF AUTHORITIES .....................................................................................iv

STATEMENT REGARDING CITATIONS ........................................................ viii

STATEMENT REGARDING JURISDICTION .....................................................1

STATEMENT OF THE ISSUES................................................................................3

STATEMENT OF THE CASE....................................................................................4

    Introduction.................................................................................................................4

    Factual and Procedural History ........................................................................7

        A.    The Claims-Based Settlement Agreement Establishes
            a Procedure for Submitting, Processing, and Paying
            Class Member Claims ..................................................................7

        B.    The Procedures for Submitting, Processing, and Paying
            Class Member Claims Under the Settlement Agreement
            Are Replaced by a "Review Process from Hell" ......................10

        C.    The Parties and the District Court Authorize Binding
            Arbitration to Resolve All Disputes About the
            Compensability of Claims Under the Settlement
            Agreement ....................................................................................13

        D.    The Arbitrator—Consistent with the Rulings of Two
            Predecessor Arbitrators—Determines the
            Compensability of the Disputed Class Members'
            Claims Under the Settlement Agreement .................................17

                1.    Two Predecessor Arbitrators Interpret,
                    Administer, and Enforce the Settlement
                    Agreement.....................................................................17

ii

2.    The Arbitrator Issues a Final Award Interpreting, Administering, and Enforcing the Settlement Agreement ................................................................. 23

E.    The District Court Vacates the Arbitrator's Final Award in Its Entirety and Denies All of the Class Members' Requests for Relief as Moot .................................... 25

STANDARD OF REVIEW .................................................... 28

SUMMARY OF THE ARGUMENT ...................................... 29

ARGUMENT ........................................................................... 32

A.    The District Court Exceeded Its Authority Under the Federal Arbitration Act by Vacating the Arbitrator's Final Award ................ 32

1.    The District Court Erroneously Failed to Defer to the Arbitrator's Interpretation of the Settlement Agreement .......... 34

2.    In Addition to Refusing to Defer to the Arbitrator, the District Court Also Misinterpreted the Claims-Processing Provisions of the Settlement Agreement Based on Mistakes of Law and Fact ......................... 37

3.    In Addition to Refusing to Defer to the Arbitrator, the District Court Also Misinterpreted the Claims-Payment Provisions of the Settlement Agreement Based on Mistakes of Law and Fact ......................... 43

B.    The District Court Erred by Concluding that a Generic Release Provision in a Settlement Agreement Bars Enforcement of the Settlement Agreement ......................... 48

C.    The District Erred by Finding that CIGNA's Participation in a 15-Year Arbitration Did Not Constitute a Waiver of the Argument that the Arbitration Was Barred by a Release .................... 52

D.    The District Erred by Denying, as Moot, All Remaining Claims for Relief on Behalf of the Class Members ............................ 56

CONCLUSION ....................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbott v. Perez*,
  585 U.S. 579 (2018)......................................................................................51

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011)......................................................................................53

*Bowers Hydraulic Dredging Co. v. United States*,
  41 Ct. Cl. 214 (Ct. Cl. 1906)......................................................................39

*DIRECTV, LLC v. Arndt*,
  546 F. App'x 836 (CA11 2013)....................................................................36

*Easley v. Hunter*,
  209 F.2d 483 (CA10 1953) ..........................................................................40

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
  156 F.3d 310 (CA2 1998) ............................................................................55

*Gen. Drivers, Salesmen & Warehousemen's Local Union No. 984 v.*
  *Malone & Hyde, Inc.*,
  23 F.3d 1039 (CA6 1994) ............................................................................55

*Gherardi v. Citigroup Glob. Mkts. Inc.*,
  975 F.3d 1232 (CA11 2020) ............................................................ 6, 28, 35

*Gilbertson v. Allied Signal, Inc.*,
  328 F.3d 626 (CA10 2003) ..........................................................................46

*Grigsby & Assocs., Inc. v. M Secs. Inv.*,
  635 F. App'x 728 (CA11 2015) ....................................................................55

*Henry v. Merrill Farms*,
  94 F.R.D. 730 (N.D. Cal. 1982) ..................................................................59

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002)........................................................................................55

*Ierna v. Arthur Muray Int'l, Inc.*,
  833 F.2d 1472 (CA11 1987) ........................................................................36

iv

*Ill. Central R.R. Co. v. Byrd*,
    44 So. 3d 943 (Miss. 2010) ................................................................. 50

*Imperato v. Navigators Ins. Co.*,
    681 F. App'x 743 (CA11 Feb. 28, 2017) ........................................... 56

*In re Managed* Care,
    756 F.3d 1222 (CA11 2014) ............................................................. 51

*Ingham Reg. Med. Center v. United States*,
    874 F.3d 1341 (Fed. Cir. 2017) ........................................................ 50

*Int'l Bhd. of Elec. Workers Sys. Council U-4 v. Fla. Power & Light Co.*,
    627 F. App'x 898 (CA 11 2015) ....................................................... 34

*Jackson v. Ogilvie*,
    426 F.2d 1333 (CA7 1970) ............................................................... 60

*Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*,
    349 F.3d 1098 (CA9 2003) ............................................................... 47

*Johnson v. Robison*,
    415 U.S. 361 (1974) ......................................................................... 41

*Jones v. Allen*,
    2013 WL 494036 (S.D. Ohio Feb. 7, 2013) ..................................... 47

*Kilgo v. Ricks*,
    983 F.2d 189 (CA11 1993) ............................................................... 58

*Kokkonen v. Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ........................................................................... 9

*Kostelac v. Allianz Glob. Corp. & Specialty AG*,
    517 F. App'x 670 (CA11 2013) ....................................................... 51

*Krakow v. Dept. of Professional Reg., Board of Chiropractic*,
    586 So. 2d 1271 (Fla. 1st DCA 1991) ............................................. 40

*Lee v. Ocwen Loan Serv.*,
    2015 WL 5449813 (S.D. Fla. Sept. 14, 2015) ................................... 5

*Lepre v. Dept. of Labor*,
    275 F.3d 59 (CADC 2001) ............................................................... 41

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*,
939 F.3d 1145 (CA11 2019) ...................................... 1, 5, 6, 8, 10, 14, 15, 17, 21, 27, 29, 30, 45, 53, 54, 55, 61

*Marine Transp. Servs. Sea-Barge Group, Inc. v. Python High Performance Marine Corp.*,
16 F.3d 1133 (CA11 1994) ...................................................................57

*Morgan v. Sundance, Inc.*,
142 S. Ct. 1708 (2022).......................................................................56

*Oxford Health Plans LLC v. Sutter*,
569 U.S. 564 (2013)................................... 7, 27, 36, 38, 43, 44, 45, 49

*Paulucci v. Gen. Dynamics Corp.*,
842 So. 2d 797 (Fla. 2003)..................................................................52

*Philadelphia Am. Life Ins. Co. v. Buckles*,
350 F. App'x 376 (CA11 2009).............................................................50

*Poertner v. Gillette Co.*,
618 F. App'x 624 (CA11 2015) .............................................................5

*Pure Wafer Inc. v. City of Prescott*,
845 F.3d 962 (CA9 2017) ...................................................................60

*Schwartz v. Fla. Board of Regents*,
807 F.2d 901 (CA11 1987) ..................................................................50

*Sec. & Exch. Comm'n v. Mut. Benefits Corp.*,
810 F. App'x 770 (CA11 2020)..............................................................2

*Shipley v. Helping Hands Therapy*,
996 F.3d 1157 (CA11 2021) ................................................................57

*Spirit of the East, LLC v. Yale Prods., Inc.*,
2023 WL 2890013 (CA11 Apr. 11, 2023)........................ 30-31, 35, 47

*Szuts v. Dean Witter Reynolds, Inc.*,
931 F.2d 830 (CA11 1991) ..................................................................35

*Tri-State Bancorporation, Inc. v. Board of Governors of Fed. Reserve Sys.*,
524 F.2d 562 (CA7 1975) ........................................................ 40-41, 47

*Turner v. Orr*,
   722 F.2d 661 (CA11 1984) ...................................................................17

*U.S. v. Haviland & Co.*,
   167 F. 414 (S.D.N.Y. 1909) .................................................................41

*Wallace v. Civil Aeronautics Bd.*,
   755 F.2d 861 (CA11 1985) ....................................................................7

*Warrior v. Gulf Nav. Co. v. United Steelworkers of Am., AFL-CIO-CLC*,
   996 F.2d 279 (CA11 1993) ...................................................................58

*World Bank v. Lewis*,
   425 So. 2d 77 (Fla. 1st DCA 1982) .....................................................40

*Zients v. La Morte*,
   459 F.2d 628 (CA2 1972) .....................................................................61

## Statutes and Other Authorities:

9 U.S.C. § 1 ...........................................................................................18

9 U.S.C. § 10 .........................................................................................42

9 U.S.C. § 10(a)(4) ........................................................................... 7, 29

9 U.S.C. § 16(a) ......................................................................................1

18 U.S.C. § 1961 .....................................................................................1

18 U.S.C. § 1962 .....................................................................................1

18 U.S.C. § 1964 .....................................................................................1

28 U.S.C. § 1291 .....................................................................................2

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1367 .....................................................................................1

29 U.S.C. § 1132(e) .................................................................................1

Fed. R. Civ. P. 23 ..................................................................................60

Fed. R. Civ. P. 53 ..................................................................................17

**STATEMENT REGARDING CITATIONS**

References to the docket entries and transcripts from the proceedings below are cited as "Dkt.:_____" and "Tr.:____," respectively.

References to the parties' November 11, 2005 Binding Arbitration Agreement is cited as "Arbitral.Agmt.:____."

References to the parties' November 15, 2005 Supplemental Agreement to Binding Arbitration Agreement is cited as "Supp.Arbitral.Agmt.:____."

References to orders and briefing entered in the arbitration are cited as "Arbitral.Order:____" and "Arbitral.Br.:____," respectively.

References to the Reasoned Opinion and Award of Joseph M. Matthews Special Master – Successor Arbitrator, appointed by the district court in the proceedings below are cited as "Final.Award:____."

## STATEMENT REGARDING JURISDICTION

The district court had subject matter jurisdiction over the original class action under federal question jurisdiction, pursuant to 18 U.S.C. §§ 1961, 1962, 1964; 28 U.S.C. §§ 1331, 1367; and 29 U.S.C. § 1132(e). The district court retained jurisdiction for all matters relating to "the interpretation, administration, and consummation of the [Settlement] Agreement." Dkt.2900:14; Dkt.2308:180, § 19.7.

On July 14, 2005, one of MCAG's class-member clients filed a motion (Dkt.4330) to enforce the settlement agreement and to direct CIGNA to pay class members' claims under that agreement. *Managed Care*, 939 F.3d at 1151. MCAG and CIGNA agreed to the withdrawal of that motion in favor of "binding arbitration" for a "final resolution of all issues relating to whether the claims for [c]ompensation under the Settlement Agreement submitted by MCAG on behalf of Class Members are payable pursuant to that agreement." *Id*. at 1151, 1163 n.7 (ellipses omitted).

On November 14, 2023, the district court issued an order granting CIGNA's motion to vacate the final arbitral award in its entirety and denying, as moot, MCAG's motion to confirm in part and modify in part the final arbitral award. Dkt.6945 (Order Granting Motion to Vacate Arbitration Award Finding the Settlement Agreement's Release Bars MCAG's Claims).

On November 30, 2023, MCAG timely filed its notice of appeal. Dkt.6954. This Court has jurisdiction. *See* 9 U.S.C. § 16(a) ("An appeal may be taken from

[a]n order … denying confirmation of an award or partial award, or … modifying, correcting, or vacating an award"); *see also* 28 U.S.C. § 1291; *accord Sec. & Exch. Comm'n v. Mut. Benefits Corp.*, 810 F. App'x 770, 774 (CA11 2020) ("In general, 'an order is deemed final if it disposes of all the issues raised in the motion that initially sparked the postjudgment proceedings'").

## STATEMENT OF THE ISSUES

The parties and the district court appointed an arbitrator to make all decisions with regard to the compensability of claims submitted by class members under a claims-based settlement agreement. The parties waived any right to appeal the arbitrator's final award unless it exceeded his power or authority under the meaning of the Federal Arbitration Act. Dkt.6677. The district court vacated the arbitrator's final award in its entirety; and denied, as moot, all remaining requests for relief on behalf of the class members. The issues for this Court's review are:

A.     Whether the district court erred by disregarding the limits of its authority to vacate a final arbitral award under the Federal Arbitration Act based on mere interpretive disagreements relating to the procedures for processing and paying claims under the settlement agreement that was the subject of the arbitration?

B.     Whether the district court erred by concluding that a generic release of past claims in a settlement agreement precludes the future enforcement of the terms of the settlement agreement itself?

C.     Whether the district court erred by concluding that CIGNA's arguments were not barred by waiver, forfeiture, and estoppel principles?

D.     Whether, based on the erroneous rulings above, the district court erred by denying, as moot, all remaining requests for relief on behalf of the class members?

3

## STATEMENT OF THE CASE

### Introduction

"[C]ourts in this Circuit" and elsewhere employ "claims-based" (or "claims-made") settlements as an alternative, or an addition to, "lump-sum" settlements to resolve multidistrict class action litigation. *Lee v. Ocwen Loan Serv.*, 2015 WL 5449813, at *1 (S.D. Fla. Sept. 14, 2015) (citing, *inter alia*, *Poertner v. Gillette Co.*, 618 F. App'x 624, 628 (CA11 2015)). When disputes arise about how to interpret and enforce the procedures for submitting, processing, and paying claims under those settlement agreements, the parties are not left to their own devices and forced to tolerate determinations that might as well have been reached by throwing darts or flipping a coin.

The parties in this case agreed to "binding arbitration" to resolve their disputes concerning the operation of a claims-based settlement agreement and to determine all issues relating to which class members' ""claims are payable pursuant to that agreement.'" *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc*, 939 F.3d 1145, 1156, 1163 n.7 (CA11 2019) (quoting Arbitral.Agmt.:¶1). In three overlapping written agreements that were the product "of significant negotiations" by the parties and their counsel—including a stipulated order endorsed by the district court—the arbitrator was directed "to conduct a de novo review" of the claims submitted by the class members; to "make all decisions with regard to the

4

compensability" of those claims; and to impose a monetary award for the value of any improperly "unpaid [c]laims" capped at $67 million. Dkt.6677:¶4; Supp.Arbitral.Agmt.: ¶5.

That is exactly what the arbitrator did: In a final award representing the culmination of a 15-year arbitral proceeding, including a three-week final evidentiary hearing, the arbitrator detailed his findings of fact and conclusions of law in nearly 300 numbered paragraphs spanning nearly 100 pages. After making it a point to "exercise restraint in the use of" the authority delegated to him—which led him to deny most of the relief sought on behalf of the class members—the arbitrator concluded that it was necessary to "correct certain specific deficiencies in the procedure" for processing and paying claims that violated the terms of the settlement agreement, resulting in a shortfall to the class members totaling over $16 million. Final.Award:¶¶118, 133-35, 240. That amount was over and above the $14 million in previously unpaid claims that "CIGNA already has paid" at an earlier stage of the arbitration. *Managed Care*, 939 F.3d at 1163 n.7.

The district court, however, vacated the final award in its entirety after reviewing the same contractual provisions as the arbitrator and concluding that he "should not have decided the compensability of those claims" in the first instance. Dkt.6945:15-16. And, as a consequence of its finding that the arbitration should not have proceeded in the first instance, the district court also denied, as moot, all

remaining requests for relief on behalf of the class members, including MCAG's motion to confirm in part and modify in part the final award as necessary to correct or clarify an apparent discrepancy. Dkt.6945:1-2. The district court exceeded its authority under the FAA by attempting to recast an interpretive difference of opinion over an identical set of contractual provisions as an act exceeding the arbitrator's authority. *See Gherardi*, 975 F.3d 1232, 1238 (CA11 2020) (quoting *Wallace v. Civil Aeronautics Bd.*, 755 F.2d 861, 864 (CA11 1985)) ("When parties choose arbitration, we cannot override their decision," and "the costs of allowing interpretive errors to stand are 'far outweighed by the general benefits that accrue ... from giving arbitral awards a strong presumption of finality'"); *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 570 (2013) ("[T]he arbitrator did what the parties had asked: He considered their contract and decided whether it reflected an agreement to permit class proceedings. That suffices to show that the arbitrator did not 'exceed[ ] [his] powers.'" (quoting 9 U.S.C. § 10(a)(4))).

The district court may be accustomed to ordinarily having the last word on matters of contract interpretation. But, by erroneously vacating the results of a binding arbitration deciding the "terms for how CIGNA would compensate class members" under the claims-based settlement agreement, the district court threatened the viability of an important tool for resolving complex litigation in the form of claims-based settlements, violated the binding precedent of this Court and the United

States Supreme Court protecting arbitral awards under the FAA, excused a blatant waiver by CIGNA, and fell short of its "responsibility to ensure the class members receive that to which they are entitled under the Settlement Agreement." *Managed Care*, 939 F.3d at 1156, 1162.

## Factual and Procedural History

Appellant Managed Care Advisory Group, LLC ("**MCAG**") files this appeal to enforce the plain terms of a class action settlement agreement, as well as the parties' subsequent agreements—including a stipulated order endorsed by the district court—appointing an arbitrator to resolve all disputes over the interpretation and enforcement of that settlement agreement. *See Managed Care*, 939 F.3d at 1152, 1156 ("The purpose of" the "binding arbitration" is "to resolve [the] disputes" over whether to "enforce[ ] the settlement agreement" and to "determin[e] whether [the] claims" made under "the Settlement Agreement were payable").

**A.**    **The Claims-Based Settlement Agreement Establishes a Procedure for Submitting, Processing, and Paying Class Member Claims**

In September 2003, after four years of litigation, Appellee CIGNA Healthcare, Inc. ("**CIGNA**") settled a multidistrict class action lawsuit alleging that it had conspired to wrongfully delay, diminish, and deny hundreds of millions of dollars' worth of insurance payments that it owed to nearly one million healthcare practitioners for medical services that they provided.

The claims-based portion of the settlement agreement invited injured class members to submit claims for reimbursement under a burden-shifting framework for processing the claims and determining the amount of CIGNA's payment obligation for claims that CIGNA had previously denied, dating back to August 4, 1990. Dkt.2308:44, § 1.27 (class period).

First, the class members shouldered the initial burden—which was particularly onerous in the days before electronic recordkeeping—to timely gather and submit the enumerated documentation and certification comprising a valid "**Proof of Claim**." Dkt.2308:132-33, § 8.3c(2)(d)(i)-(ii) (deadlines and documentation); *id.*:136, § 8.3c(2)(f) (certification).

Second, the burden shifted to CIGNA to rebut a timely and valid Proof of Claim by compiling a "**Review File**," which was expressly defined to consist of "all records documenting prior CIGNA HealthCare payments" for the Proof of Claim; as well as "all other documents prepared or obtained by CIGNA HealthCare in its initial review of the Proof of Claim[.]" *Id.*:138-39, § 8.3c(2)(h)(i).

Third, if CIGNA "fail[ed] to assemble and forward ... the Review File," then the Proof of Claim "*shall be deemed approved*," and "payment shall be made to the Class Member." *Id.*:139 § 8.3c(2)(h)(ii) (emphasis added).

Fourth, one of two external reviewers—either the settlement administrator Epiq Systems, Inc. ("**EPIQ**") or the independent review entity known as IMEDECS

8

(the "**IRE**")—would process the Proof of Claim and the Review File under the standards set forth in the settlement agreement to determine whether to uphold or overturn CIGNA's denial of payment, which "[d]ecisions . . . *shall be final* and not subject to review by the Court or any other tribunal." *Id*.:135-36, § 8.3c(2)(e) & (g) (how to process Proofs of Claim); *id*.:138-44, § 8.3c(2)(h) (how to process Review Files) (emphasis added).

Fifth, CIGNA was required to provide "Settlement Consideration," consisting of "its uncapped obligation[ ] to pay all valid … Proofs of Claim," by "replenishing the Claim Distribution Fund as necessary to pay all Valid Proofs of Claim" "until such time as all funds are distributed to Class Members." *Id*.:43, § 1.21 (defining Claim Distribution Fund); *id*.:57-58, § 1.120 (defining Settlement Consideration); *id*.:121, § 8.3a (how to pay and distribute funds).

Sixth, at "the conclusion of the settlement process," EPIQ was required to "provide a final accounting," and the district court retained jurisdiction "for purposes of implementing and enforcing the Settlement embodied in this Agreement." *Id*.:158, § 9.9 (final accounting); *id*.:180, § 19.7 (reservation of jurisdiction); *accord Managed Care*, 939 F.3d at 1162 (citing *Kokkonen v. Life Ins. Co. of Am.*, 511 U.S. 375, 380 (1994)) ("Because the district court retained jurisdiction over the administration of the Settlement Agreement, which set the terms for how CIGNA would compensate class members," it "retains ancillary jurisdiction to enforce the

agreement," and "has a responsibility to ensure the class members receive that to which they are entitled under the Settlement Agreement").

Seventh, the settlement agreement contained a generic release precluding re-litigation of "any and all claims that have been or could have been asserted by or on behalf of any or all Class Members …, and which arose prior to Final Approval … except as otherwise provided in this Agreement." *Id.*:55, §§ 1.108-1.110 (defining "Released Claims"); *id.*:161-63, § 13 (Release); Dkt.2900 (final approval).

## B.    The Procedures for Submitting, Processing, and Paying Class Member Claims Under the Settlement Agreement Are Replaced by a "Review Process from Hell"

CIGNA was confident that most class members would be unable to assemble the documentation necessary to submit timely and valid Proofs of Claim. In fact, CIGNA initially received so few claims that it paid any claim less than $2,000, regardless of whether the claim was accompanied by any documentation. *See* 2/5/21 Hr'g.Tr.:2163-64. CIGNA was not alone in expecting class members to struggle to obtain reimbursement under the settlement agreement. At that time, the American Medical Association and its members were growing "disappointed in the results" of a similar settlement with another large medical insurance company "because of the [logistical] difficulty" they experienced in gathering the documents necessary to submit claims and obtain the payments they were owed, in the days

before electronic recordkeeping, memory sticks, and cloud computing were commonplace. *See generally* 1/25/2021 Hr'g.Tr.:165-66.

Thus, the AMA approached MCAG—which was providing auditing services relating to insurance underpayments—and recruited MCAG to adapt its auditing expertise to help the class members pursue their claims under the settlement agreement. 1/25/21 Hr'g.Tr.:166-68; 1/27/21 Hr'g.Tr.:563-74. Facing competition from other claims processing entities, time constraints imposed by the settlement agreement, and technological hurdles of the time, MCAG developed a state-of-the-art automation process and secured inventive partnerships and investors to help thousands of healthcare providers meet the "rigorous rules" for submitting claims under the settlement agreement. 1/25/21 Hr'g.Tr.:170-71, 174-76; 1/26/21 Hr'g.Tr.:366-68, 395-398; 1/27/21 Hr'g.Tr.:497-500, 572, 575. As one MCAG employee put it, "My wife was a work widow through the crunch times" which required working up to "48 hours straight." 1/26/21 Hr'g.Tr.:406.

As a result of MCAG's success in assembling and submitting claims on behalf of thousands of doctors, CIGNA changed its approach to paying class members' claims in an effort to reduce its expanding payment obligations. K. McLeod Dep. Tr.:162 (MVC-003345). Eventually, the Compliance Work Group established by the settlement agreement would conclude that "the claims process was not working as planned." Dkt.4330:11-15. Indeed, CIGNA stopped following the settlement

agreement's burden-shifting protocol for submitting, processing, and paying class member claims altogether.

For example, the settlement agreement defined "Review File" to identify the specific clinical and payment records that were minimally necessary for an independent, external reviewer to reliably substantiate CIGNA's decision to deny any class member's Proof of Claim for reimbursement. CIGNA, however, devised a flowchart depicting a "review process from hell," which not only purported to eliminate its obligation to provide a Review File, but also included 38 nodes resulting in a dead-end of non-payment for the class member. The AMA and other medical associations were "emphatic" that this process was "inconsistent with the rubric of the settlement documents and the requirements for claims filing." 1/25/21 Hr'g.Tr.:182; 1/27/21 Hr'g.Tr.:518.

Notably, CIGNA's representatives testified that the Review Files had not only been preserved as a "permanent record that is retained on [CIGNA's] system" and remained reasonably accessible, but that CIGNA had **actually** accessed the Review Files itself before deciding to forward inadequate substitutes to the external reviewers. *See* 03/19/08 Hr'g.Tr.:154, 179-80; 6/18/08 Arbitral.Order; 2/4/21 Hr'g.Tr.:2009-10, 2024-25, 2036-38; 2/5/21 Hr'g.Tr.:2091-93, 2143-44; 2/16/21 Hr'g.Tr.:2353-54, 2386-87, 2407-09, 2410-11. Apparently fearing that providing the Review Files to the external reviewers as required would result in those claims being

approved for payment, CIGNA elected to provide "no copies of source information" and "no Review File" to substantiate its denial of over 120,000 class member claims worth tens of millions of dollars. Final.Award:¶168; *accord id*.:¶162 (citing 03/19/08 Hr'g.Tr.:179-80 ("CIGNA's own representations … without source documentation … were not adequate to serve as the Review File required under the Settlement Agreement").

Accordingly, one of MCAG's clients, Texas Children's Pediatric Associates, filed a motion to enforce the settlement agreement because CIGNA had caused the external reviewers "to improperly process claims" in contravention of the settlement agreement, and thus "requested that the district court direct CIGNA to pay [those] claims" as required. *Managed Care*, 939 F.3d at 1151 (citing Dkt.4330 (motion to enforce)). In response to that motion, CIGNA proposed—and MCAG agreed—"to binding arbitration of the matter" in order to resolve the parties' dispute over the compensability of the claims MCAG had submitted on behalf of class members under the procedures required by the settlement agreement. *Id*.

## C.   The Parties and the District Court Authorize Binding Arbitration to Resolve All Disputes About the Compensability of Claims Under the Settlement Agreement

On November 15, 2005, the parties executed an interlocking arbitral agreement and supplemental arbitral agreement to submit their "dispute concerning the compensability of certain claims submitted … pursuant to the Settlement

13

Agreement" to "binding arbitration … for final resolution of all issues relating to whether [those] claims … are payable pursuant to that agreement. Arbitral.Agmt.:1; *accord* Supp.Arbitral.Agmt.¶5 ("[T]he purpose of the Arbitration is for the Arbitrator to conduct a de novo review of the compensability of MCAG's claims under the Settlement Agreement," and "whether th[ose] claims qualify for payment under the terms of the Settlement"); *accord Managed Care*, 939 F.3d at 1156 (quoting arbitral agreement). And, in June 2020, the district court endorsed a stipulated order that incorporated the terms of the parties' existing arbitral agreements and confirmed the authority of the arbitrator to "make all decisions with regard to the compensability of" the claims submitted by the class members under the settlement agreement. Dkt.6677:¶4.[1]

Specifically, the arbitral agreement provided that the parties intended to "submit the[ir] dispute to a single arbitrator for final resolution of all issues relating to whether the claims for [c]ompensation" submitted by the class members "under the Settlement Agreement … are payable." Arbitral.Agmt.:¶1. Each party would be "free to raise any issues that … could have been raised before" the district court, and

---

[1] The parties initially agreed to keep the supplemental arbitral agreement "strictly confidential" from the arbitrator "because of the potential prejudice arising from [its] disclosure," primarily including the high-low arrangement reflected in the supplemental arbitral agreement. Supp.Arbitral.Agmt.:¶¶7-8. But the parties eventually agreed to disclose the supplemental arbitral agreement, including its high-low arrangement, to both successor arbitrators. Final.Award:¶¶4-5.

the arbitrator would be vested with "full authority to conduct the Arbitration" and "all pre-hearing matters" in "any manner he deems appropriate." *Id.*:¶¶ 5-6; *accord id.*:¶¶4&8.

In general, the supplemental arbitral agreement confirmed the parties' "agree[ment] that the purpose of the Arbitration is for the Arbitrator to conduct a de novo review of the compensability of MCAG's claims under the Settlement Agreement," and "whether the claims submitted by MCAG on behalf of Class Members qualify for payment under the terms of the Settlement." Supp.Arbitral.Agmt.:¶5. In particular, the supplemental arbitral agreement reflected the parties' expectation that the arbitrator would necessarily quantify the value of compensable claims and issue a monetary ruling "award[ing] MCAG an amount between $7.5 million and $67 million":

> MCAG reserves the right to seek an award no greater than $94 million from the Arbitrator. However, in the event that MCAG receives an award that is greater than $67 million, MCAG agrees that it will accept $67 million as payment in full on that award.

> \* \* \*

> [I]n the event that the Arbitrator awards MCAG less than $7.5 million, CIGNA HealthCare agrees that it will pay MCAG $7.5 million."

> \* \* \*

> In the event that the Arbitrator awards MCAG an amount between $7.5 million and $67 million, that amount will be payable to MCAG[.]

*Id.*:¶¶1-3.

15

Approximately 15 years into the arbitral proceedings, the parties and the district court executed a stipulated order "appoint[ing] Joseph Matthews as Special Master solely to perform the functions now performed by the Arbitrator." Dkt.6677:¶2. In other words, Mr. Matthews would continue to be bound by the preexisting "Arbitration and Supplemental Arbitration Agreements"; "assume the role of the Arbitrator"; and "issue a reasoned opinion" in which he would "make all decisions with regard to the compensability of [the] Claims now in Arbitration." Dkt.6677:¶¶3-5.[2]

In all three written agreements—i.e., the arbitral agreement, the supplemental arbitration agreement, and the stipulated order endorsed by the district court—the parties waived any right to appeal the final award, except under the limited grounds for appealing an arbitrator's ruling under the Federal Arbitration Act. *See Turner v. Orr*, 722 F.2d 661, 664 n.4 (CA11 1984) ("Although Fed.R.Civ.P.53 grants the parties certain rights of appeal from a special master's decision, the parties are free to agree to waive some of those rights"). The only relevant ground for appealing the

---

[2] The purpose of the stipulated order was to "[t]ransfer all litigation regarding *MCAG v. CIGNA* to federal court" in the wake of this Court's interlocutory order distinguishing between disputed "claims that have not yet been paid" (which were "pending in the arbitration") and disputes regarding the "proceeds of claims that CIGNA has already paid" (which the district court "may not defer to the arbitrator"). *Managed Care*, 939 F.3d at 1162. But the stipulated order did not alter or affect the scope of the arbitrator's authority to decide the compensability of claims under the settlement agreement.

final award in this case is "where the [arbitrator] exceeds his power or authority, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Dkt.6677:¶6(d); *accord* Dkt.6110-1:¶1 ("There shall be no right of appeal from the arbitrator's decision, except that either party may challenge the arbitrator's decision on grounds permissible under … the Federal Arbitration Act ('FAA'), 9 U.S.C. sec. 1, *et seq.*"); Supp.Arbitral.Agmt.:¶6 ("No court or other tribunal, . . . shall have jurisdiction over any issue arising out of this Agreement, except . . . to confirm, modify and/or vacate any award in accordance with the FAA").

**D.** **The Arbitrator—Consistent with the Rulings of Two Predecessor Arbitrators—Determines the Compensability of the Disputed Class Members' Claims Under the Settlement Agreement**

All three arbitrators—including the arbitrator that issued the final award—confirmed that CIGNA and the external reviewers had failed to correctly interpret, implement, and comply with the claims-processing and claims-payment provisions of the settlement agreement.

1. *Two Predecessor Arbitrators Interpret, Administer, and Enforce the Settlement Agreement*

In May 2007, the first arbitrator, Hon. Edward B. Davis, the former Chief Judge for the United States District Court for the Southern District of Florida, observed in an initial written ruling that "the Settlement Agreement provides for an elaborate, multi-step procedure for the processing of claims," which constitutes "the

most comprehensive and efficient procedure for assessing the validity of … claims" submitted under the settlement agreement. 5/23/07 Arbitral.Order:6. Judge Davis found, however, that the parties' dispute over the interpretation of the claims-processing procedure caused it to "br[eak] down at the very early stages," and thus attempted to "remove that preliminary roadblock" by providing his definitive "interpretation of the relevant terms" and directed the parties "to follow the claims processing procedure set forth in the Settlement Agreement as interpreted and otherwise ordered" in his written ruling. *Id.*:1-3, 11.

While CIGNA had originally denied more than 98% of the class members' claims, the external reviewers overturned 53% of those denials in their initial reprocessing of the first 108,000 claims (out of a total of over 500,000 claims) under Judge Davis's initial ruling ("**Process 2**"). *See* 2007-2008 EPIQ weekly reports (MCAGPROD-137437-84). If Process 2 had been allowed to continue for the remaining class member claims at that rate, then it would have resulted in the approval of class member claims totaling approximately $50 million. Thus, CIGNA acted to stop Process 2 in its tracks.

For instance, CIGNA reached out to the external reviewers to insist that they should accept inadequate summary documentation—including "spreadsheets" and "index cards" lacking any source information—in lieu of the Review Files required by the express terms of the settlement agreement:

18

> There was apparently a little confusion on the documentation that we submitted for the review files. We have provided the rationale for our denials on a spreadsheet that also has the claim information. **The info on the spreadsheet along with the documentation submitted by MCAG** (A/R record, any clinical notes etc.--in the web viewer) **will be available as the total review file.**

10/23/07 Email from K. McLeod (MCAGPROD-138584-85). But, as the external reviewers explained, they could not "tell why [a] claim was denied" in the absence of "an actual Review File." CIGNA-0000745-47.

Accordingly, in June 2008, Judge Davis issued another written ruling to "enforce[ ] the Settlement Agreement and the Arbitrator's prior Orders." 6/18/08 Arbitral.Order:1; *accord id.*:3 ("[T]he parties made an agreement, and must live up to the procedures in that agreement as the means of effectuating their intent"). While "MCAG essentially follow[ed] the Arbitrator's mandates by limiting its arguments to the confines of the claims processing procedure set forth in the Settlement Agreement—namely, whether CIGNA complied with the Review File requirement in that procedure"—CIGNA did not. *Id*:6; *accord id.*:5-6 ("CIGNA," like a "ship[ ] passing in the night, … makes no argument whatsoever with respect to the Review File requirement," and instead "step[s] outside the bounds of the claims procedure set forth in the Settlement Agreement," taking "positions on an entirely different plane," and demanding that the arbitrator "make a number of substantive determinations with respect to various categories of class member claims").

Thus, Judge Davis reaffirmed that CIGNA could not satisfy its burden of providing a "Review File" under the settlement agreement by generating spreadsheets and index cards lacking critical source information. 03/19/08 Hr'g.Tr.:179:5-10 ("There's no explanation here on why it was paid correctly? How would any third-party understand why it was paid correctly?"). In turn, Judge Davis reiterated that CIGNA's burden of proof required it to "compile and forward a 'Review File' on each 'denied' claim," including "all existing, readily accessible documents in CIGNA's possession at the time of its review of a claim" and to "certif[y] that the Review File contains all existing, reasonably accessible documents in CIGNA's possession at the time of its review of the claim." 6/18/08 Arbitral.Order:13; *accord id.*:9.

In May 2010, Judge Davis passed away, and a new Arbitrator, Thomas Schultz, was appointed, who reinforced Judge Davis's findings about CIGNA's efforts to frustrate the procedures for processing and paying claims submitted under the settlement agreement. Although CIGNA and the external reviewers entered into a joint defense/common interest agreement to block discovery geared towards ensuring compliance with the settlement agreement, and although this Court prevented the enforcement of arbitral summonses "for the purpose of determining whether [the] claims" at issue "were payable" under the settlement agreement,

20

MCAG was still able to obtain a documentary trail of CIGNA's recalcitrance. *See Managed Care*, 939 F.3d at 1151, 1156.

For example, in August 2008, one month after Judge Davis clarified the definition of "Review File" under the settlement agreement, Neil Manning, a representative of one of the external reviewers, advised CIGNA that the "spreadsheets" that CIGNA continued to try to pass off as Review Files did not "contain enough information for us to use for a review without other supporting documentation." CIGNA-0000234-36 ("We have been waiting review files like we received last time (screen shots, word documents, etc)"). Manning's employment was unceremoniously terminated shortly after he sent that email, but his replacement, David Garcia, voiced the same concerns. 1/27/21 Hr'g.Tr.:528 (MCAG employee testifying that "CIGNA demanded that they get rid of [Manning] because he was overturning their denials and found in the settlement agreement if they didn't have a review file, he was approving the claim"). For instance, Garcia warned that the inadequate summaries that CIGNA provided "without any supplemental documentation … will be overturned." CLTx-000058; *accord* 1/27/21 Hr'g.Tr.:538-39 ("[Garcia] told me directly" that "CIGNA put pressure on him to change" his position "to keep his job" and he "had a child that was sick").

When the re-processing resumed under Arbitrator Schultz ("Process 3"), CIGNA denied an even higher percentage of claims—a denial rate of 99%—which

applied across the board regardless of which MCAG client had submitted the claim. For example, Duke University's health system submitted 19,600 claims, and CIGNA recommended paying only 210 claims. Similarly, the Florida Eye Clinic submitted 22,000 claims, and CIGNA recommended paying only 430 claims, despite the fact that its CEO, Ms. Parm, testified: "We only submitted what we believed met the agreement that had been written, and that was the whole purpose." 1/26/21 Hr'g.Tr.:299 (G. Parm).

But, when the experienced, reputable, and well-established settlement administrator that employed Manning and Garcia ("**EPIQ**") began overturning its denials too frequently, CIGNA once again intruded to frustrate the terms of the settlement agreement. Among other things, CIGNA cajoled EPIQ to violate the settlement agreement by impermissibly transferring its review duties to the "independent review entity" ("**IRE**"), IMEDECS, a small business that relied on part-time employees and was highly dependent on CIGNA for its finances. And, in contrast to EPIQ, which was overturning over 50% of CIGNA's denials, the pliant IRE tolerated CIGNA's refusal to provide a compliant Review File. Thus, the IRE followed CIGNA's lead by disregarding the procedures imposed by the settlement agreement and ultimately overturned less than 15% of CIGNA's denials, in violation of the settlement agreement.

22

2.    *The Arbitrator Issues a Final Award Interpreting, Administering, and Enforcing the Settlement Agreement*

Following his appointment under the district court's stipulated order, Special Master/Substitute Arbitrator Joseph M. Matthews held a three-week evidentiary hearing in 2021, culminating in a final award that addressed the arguments raised in the parties' extensive written briefing; comprised nearly 300 numbered paragraphs of factual findings and legal conclusions; and "determine[d] the compensability of the class members' claims … pursuant to the Settlement Agreement." Final.Award:¶240. Notably, the arbitrator also compiled and reproduced all of the relevant provisions of the settlement agreement that contributed to his ruling and attached them as an exhibit to his final award. *See Id.*:88-97 (Exhibit B).

At the outset, "[c]onsistent with the[ ] orders of" his two predecessor arbitrators," Arbitrator Matthews' final award "exercise[d] restraint in the use" of the expansive powers granted to him. *Id.*:¶118. Specifically, all three arbitrators recognized the limits of their authority to "review or overturn a substantive decision" by any external reviewer under the terms of the settlement agreement. *Id.*:¶¶131-34 But, all three arbitrators agreed, the terms of the arbitral agreement, the supplemental arbitral agreement, and the stipulated order obligated them "to review the procedures employed" by CIGNA and the external reviewers "to assure that they complied with the Settlement Agreement." *Id*. In other words, Arbitrator Matthews' final award "accept[d] and appl[ied] the decisions" of the predecessor arbitrators by not

reviewing the external reviewers' "substantive decisions," and only reviewing whether they "followed the procedures dictated by the Settlement Agreement correctly." *Id.*:¶¶129, 134; *accord* 12/22/09 Arbitral.Order:1 (quoting Dkt.2308:144, § 8.3c(2)(h)(iv)(G)).

Thus, the final award first construed and enforced the claims-processing provisions of the settlement agreement to conclude that over 80,000 class member claims had been denied for payment even though CIGNA provided "no copies of source information" and "no Review File," in violation of the terms of the settlement agreement. Final.Award:¶168; *accord id.*:¶162 (citing 03/19/08 Hr'g.Tr.:179-80) ("CIGNA's own representations … without source documentation … were not adequate to serve as the Review File required under the Settlement Agreement"). In other words, the final award identified a "procedural flaw" that contravened "the claim processing" procedure required by the terms of the settlement agreement. *Id.*:¶240 (citing, *inter alia*, Dkt.2308:139, § 8.3c(2)(h)(ii)).

The final award next construed and enforced the claims-payment provisions of the settlement agreement to conclude that CIGNA had not fulfilled its obligation to provide "Settlement Consideration," consisting of its 'uncapped obligation [ ] to pay all … Valid Category Two Proofs of Claim,'" in violation of the terms of the settlement agreement. *Id.*:¶239. Because the parties did not dispute the value of those claims—only whether they were required to be paid under the terms of the settlement

agreement—the arbitrator performed the ministerial computation of the funds that CIGNA had failed to deposit "into the Claim Distribution Fund for distribution under Court supervision to MCAG Class Members" for compensable claims in contravention of the terms of the settlement agreement. *Id.*:¶¶2, 115-16, 135, 240 (citing, *inter alia*, Dkt.2308:57, 121, §§ 1.120, 8.3a).

Finally, the final award was in accord with the "'high-low' agreement" reflected in the parties' supplemental arbitral agreement, which permitted the "the Arbitrator [to] award[ ] MCAG an amount between $7.5 million and $67 million" based on its determination as to "whether the claims submitted by MCAG on behalf of Class Members qualify for payment under the terms of the Settlement." *Id.*:¶¶3-5; Arbitral.Agmt.:¶1; Dkt.6677:¶4.

**E. The District Court Vacates the Arbitrator's Final Award in Its Entirety and Denies All of the Class Members' Requests for Relief as Moot**

In November 2023, the district court vacated the final award in its entirety. Dkt.6945. Contrary to all facts and relevant legal authority, the district court "agree[d] with Cigna that the Arbitrator … should not have decided the compensability of th[e] claims in arbitration." Dkt.6945:1. *But see* Dkt.6677:¶4 (the district court appointing "the Arbitrator [to] make all decisions with regard to the compensability of [the] Claims now in Arbitration").

While its order is not a model of clarity, the district court apparently held that the arbitrator exceeded his authority by conducting any arbitration at all because "the

Settlement Agreement's [generic] release"—which applies to claims that "arose prior to Final Approval" of the settlement agreement—supposedly "bars [all] claims" to enforce the claims-processing and claims-payment provisions of the settlement agreement itself. Dkt.6945:1, 4-6. *But see Managed Care*, 939 F.3d at 1156 ("[T]he purpose of the arbitration was to resolve disputes involving … claims *that arose out of the Settlement Agreement*").

Moreover, in subsidiary findings that do not cogently relate to its ultimate holding based on the generic release, the district court also attempted to recast the arbitrator's interpretation of the settlement agreement as an act that supposedly exceeded his authority. Dkt.6945:5, 12-14 ("[T]he issue is whether the Arbitrator's Final Award exceeds his authority under the Settlement Agreement" by "honing in on th[e] Review File" requirement and "allow[ing] a monetary ruling"). *But see Oxford*, 569 U.S. at 569 ("[T]he sole question … is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong").

Then, having found that the arbitrator's final award should be vacated in its entirety, the district court did not hesitate to deny all of MCAG's remaining meritorious requests for relief as moot—including MCAG's motion that the arbitrator imposed an impermissible "split-the-baby" compromise that contravened the "plain text" of the settlement agreement. Dkt.6845 (order); Dkt.6821 (motion).

26

*But see* 9/19/23 Hr'g.Tr.:57 ("THE COURT:   So … both [parties] agree" that "the arbitrator was [not] correct in splitting the baby"); 12/12/23 Hr'g.Tr.:9 ("THE COURT:   I think the [arbitrator] split the baby in half, and I'm not sure you can do that").

Finally, "[i]n view of [its] finding that … the arbitration should not have proceeded in the first instance," the district court issued a separate order denying, as moot, a motion to enforce the settlement agreement by compelling the settlement administrator to provide a final accounting "relevant as to [the] claims that proceeded to arbitration." Dkt.6948:1. (order); Dkt.6837 (motion); Dkts.6849, 6852 (joinders).

## STANDARD OF REVIEW

The district court's "determin[ation] that the arbitrator[ ] 'exceeded [his] powers'" under 9 U.S.C. § 10(a)(4) is "a legal determination that" this Court "reviews de novo." *Gherardi*, 975 F.3d at 1236.

"[T]his Court reviews a district court's interpretation of a settlement agreement *de novo*, and decisions regarding motions to enforce settlements for abuse of discretion." *Managed Care*, 939 F.3d at 1153.

## SUMMARY OF THE ARGUMENT

The parties and the district court delegated all authority to an arbitrator to "interpret[ ]" and "administer[ ]" the "terms for how CIGNA would compensate class members" under a claims-based settlement agreement, as necessary "to ensure the class members receive that to which they are entitled under the Settlement Agreement." *Managed Care*, 939 F.3d at 1156, 1162. Specifically, the arbitrator was authorized to "make all decisions with regard to the compensability" of the claims submitted under the settlement agreement, and to "issue a reasoned opinion" representing the "final resolution of all issues relating to whether th[ose] claims for compensation … are payable pursuant to that agreement," including a "de novo review of the compensability of [the] claims" as necessary to issue a monetary "award [no] greater than $67 million … as payment in full" for any improperly unpaid claims. Dkt.6677:¶¶4-5; Arbitral.Agmt.:¶1; Supp.Arbitral.Agmt.:¶5.

<u>First</u>, the district court erred by attempting to recast a disagreement over the correct interpretation of the settlement agreement as an act in excess of the arbitrator's authority, and thus violated the FAA by vacating the arbitrator's final award. The arbitrator did not "ignore the plain language" of the underlying settlement agreement, but rather construed the exact same provisions as the district court did, and thus the district court was obligated "to defer entirely to the arbitrator's interpretation." *Spirit of the East, LLC v. Yale Prods., Inc.*, 2023 WL 2890013, at *3

29

(CA11 Apr. 11, 2023). And, even if the district court were not required to defer to the arbitrator's final award as a matter of law, the district court was factually mistaken that the arbitrator either "honed in on" a provision of the settlement agreement "in isolation" or could not issue a "monetary ruling" consistent with the parties' agreements expressly authorizing a monetary ruling.

Second, the district court erred by concluding that the settlement agreement's generic release bars MCAG's claims to enforce the claims-processing and claims-payment provisions of the settlement agreement itself. A generic release only bars re-litigation of *past* claims that could have been asserted in the underlying litigation based on facts that arose *before* the final approval of the settlement agreement. A generic release does not bar *future* claims to enforce the settlement agreement itself based on allegations that a party failed to follow the methodology for processing and paying claims under the settlement agreement *after* its final approval.

Third, the district court erred by finding there was not "sufficient record evidence that [CIGNA] waived the argument" that the class members' claims for compensation under the settlement agreement were barred by a general release despite CIGNA raising the argument it for the first time on the eve of the final evidentiary hearing 15 years after the arbitration commenced; despite paying $14

30

million in unpaid claims during the arbitration; and despite seemingly raising—and losing—the argument during the arbitration.

Fourth, on remand, the district court should consider the merits of any remedy that it hastily denied as moot based on the flawed premise that the arbitrator "should not have decided the compensability of those claims in arbitration" and that "the arbitration should not have proceeded in the first instance." Dkt.6945:16; Dkt.6948:1.

## ARGUMENT

In June 2020, the district court endorsed a stipulated order, incorporating the parties' prior arbitral agreements dating back to November 2005, which broadly directed the arbitrator to "make all decisions with regard to the compensability of [c]laims" for payment submitted by class members under a settlement agreement, and to "issue a reasoned opinion." Dkt.6677:¶4.

In November 2023, after the arbitrator held a three-week evidentiary hearing and issued a final award in 2021, the district court entered an order "agree[ing] with Cigna that the Arbitrator … should not have decided the compensability of those claims" and vacated the arbitrator's final award in its entirety. Dkt.6945:16. The district court's order, which this Court reviews de novo, was clearly erroneous.

**A.** **The District Court Exceeded Its Authority Under the Federal Arbitration Act by Vacating the Arbitrator's Final Award**

The parties and the district court intended to "create an enforceable arbitration agreement under the FAA" under a grant of authority that could hardly be more expansive or less susceptible to being overturned. Arbitral.Agmt.:¶7; Dkt.6677:¶¶2-4 ("The Parties agree to the appointment of Joseph Matthews … solely to perform the functions now performed by the Arbitrator," to "assume the role of the Arbitrator," and to be "bound by the Settlement Agreement, the Arbitration and Supplemental Arbitration Agreements, and the 11th Circuit Opinion").

32

Specifically, the parties and the district court "agree[d] that the purpose of the Arbitration is to conduct a de novo review of the compensability" of the claims submitted by the class members under the settlement agreement; to "make all decisions with regard to the compensability" of the claims submitted under the settlement agreement"; and to "issue a reasoned opinion" representing the "final resolution of all issues relating to whether the claims" for compensation "are payable pursuant to the" settlement agreement, pursuant to a high-low arrangement in which CIGNA "agreed that it will pay MCAG [at least] $7.5 million," and in which MCAG agreed to accept [no more than] $67 million" as "as payment in full" for any "unpaid [c]laims." Arb.Agmt.:¶1; Supp.Arbitral.Agmt.:¶3; Dkt.6677. Those provisions authorizing the arbitrator to interpret and enforce the terms of the settlement agreement relating to the processing and payment of class members' claims are not ambiguous, but in all events a "presumption of arbitrability applies." *Int'l Bhd. of Elec. Workers Sys. Council U-4 v. Fla. Power & Light Co.*, 627 F. App'x 898, 903-04 (CA11 2015).

Moreover, the parties and the district court agreed that there "shall be no right of appeal from the arbitrator's decision, except" under the limited grounds permitted under the FAA—namely, "where the [arbitrator] exceeds his power or authority." Arbitral.Agmt.:¶1; Supp.Arbitral.Agmt.:¶6; Dkt.6677:¶6. The district court, however, erroneously accused the arbitrator of "exceed[ing] his authority under the

33

Settlement Agreement." Dkt.6945:15. Because the arbitrator did not "ignore the plain language" of the settlement agreement—and instead construed the exact same provisions that the district court did—the district court was required to "defer entirely to the arbitrator's interpretation" of the settlement agreement, "no matter how wrong" the district court believed it to be. *Spirit,* 2023 WL 2890013, at *3.

1.     *The District Court Erroneously Failed to Defer to the Arbitrator's Interpretation of the Settlement Agreement*

Tellingly, the district court's order cites just one pertinent binding legal authority for the proposition that the arbitrator purportedly exceeded his authority either by "honing in on" a requirement for processing claims under the settlement agreement, or by "quantifying" the payment owed for claims under the settlement agreement. Dkt.6945:12-15 (citing *Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830, 830-32 (CA11 1991)). But that lone case illuminates the source of the district court's error.

To be sure, under the case cited by the district court, a panel of two arbitrators might exceed its authority by issuing an award "when the parties' arbitration agreement" required the arbitration to be conducted "before at least three arbitrators." *Szuts*, 931 F.2d at 830-32. Other "illustrative examples" of scenarios where this Court (or the Supreme Court) have allowed vacatur of an award that exceeded the arbitrator's authority are similar in kind, as they all involve an

34

arbitrator "effectively dispens[ing] his own brand of industrial justice" outside of the contract that he was asked to interpret. *Gherardi*, 975 F.3d at 1237.

But in a case like this one, where the district court believes that the arbitrator exceeded the authority by misinterpreting the underlying settlement agreement that he was asked to construe, "the sole question … is whether the arbitrator (even arguably) interpreted" the settlement agreement and issued a final award that "dr[ew] its essence" from the settlement agreement. *Oxford*, 569 U.S. at 569-70. In other words, by "assign[ing] a dispute" over the meaning of the settlement agreement to the arbitrator, the parties and the district court "opt[ed] out of the court system," precluding any appeal of the arbitrator's final "award in the traditional sense," and limiting any review to a "quasi-jurisdictional ... check to make sure that" the arbitrator had "authority to reach the issue[ ]" that he resolved. *Gherardi*, 975 F.3d at 1236-37.

But, by relying on a single case where an arbitrator had exceeded his authority for reasons *extrinsic* to the underlying contract, the district court failed to appreciate that the standard for vacating an arbitrator's final award for a reason *intrinsic* to the underlying contract "is 'among the narrowest known to the law.'" *Gherardi*, 975 F.3d at 1236-37 ("Following Supreme Court precedent," the "'very unusual circumstances' … which permit vacatur if 'the arbitrators exceeded their powers'" must be construed "narrowly—very narrowly"). Thus, even if the district court had

35

accurately concluded that the arbitrator's interpretation of the settlement agreement was "implausible" or based on "implied terms [that] seem to contradict the contract's express terms," its reasons for vacating the final award would all still "boil[ ] down to a claim 'that the arbitrator[ ] misinterpreted" the settlement agreement, which "is a far cry from a valid claim that" he "exceeded [his] powers" by "expan[ding] the arbitrable issues." *Id.* at 1239.

As in *Ierna v. Arthur Muray Int'l, Inc.*, the parties here disputed whether "the language of the . . . agreement" could "be interpreted to include" the authority to award the remedy that the arbitrators issued. 833 F.2d 1472, 1476 (CA11 1987) ("Appellants … argue that that the arbitrators were without authority to award attorneys' fees"). But because the governing contract determined whether the arbitrators had the authority to issue the award, this Court deferred to the arbitrators' interpretation. *Id*. at 1476-77 ("These arguments" as to "why the language of the … agreement should not be interpreted to include attorneys' fees … presumably and hopefully were made to the arbitrators"). Here too, "[b]ecause the arbitrator arguably interpreted the" settlement agreement to permit a monetary ruling, "the district court should have ended its inquiry and denied [CIGNA's] petition for vacatur." *DIRECTV, LLC v. Arndt*, 546 F. App'x 836, 840 (CA11 2013).

2.     _In Addition to Refusing to Defer to the Arbitrator, the District Court Also Misinterpreted the Claims-Processing Provisions of the Settlement Agreement_

In all events, the district court would not have been permitted to vacate the final award even if the arbitrator had committed a legal error by "honing in on" one provision of the settlement agreement to the exclusion of any other. *See Oxford*, 569 U.S. at 568 ("So long as an arbitrator 'makes a good faith attempt' to interpret a contract, 'even serious errors of law will not subject his award to vacatur'"). But the district court compounded its error by misreading the record. In fact, the arbitrator— along with both predecessor arbitrators—expressly resolved the tension between two seemingly competing provisions of the settlement agreement, including the provision that the district court falsely accused the arbitrator of overlooking.

On one hand, for example, MCAG argued that the "Review File" requirements unambiguously defined the documents necessary for an external reviewer to reliably determine whether to approve a class member's claim for compensation under the settlement agreement. In turn, MCAG argued, CIGNA forwarded inadequate Review Files to the external reviewers and otherwise derailed the claims-processing protocols outlined in the settlement agreement. Accordingly, MCAG argued, it was necessary to enforce the provision of the settlement agreement mandating that any claims lacking a Review File "*shall be deemed approved* [for]

37

payment" without any further review or exercise of discretion permitted. Dkt.2308:139 § 8.3c(2)(h)(ii) (emphasis added).

On the other hand, for example, CIGNA argued that the Review File requirements were ambiguous or otherwise unenforceable. In turn, CIGNA argued, the summaries that it provided were adequate to permit any external reviewer to exercise its discretion to deny any class member's claim in the absence of a compliant Review File and without following the other claims-processing protocols outlined in the settlement agreement. Accordingly, CIGNA argued, it was necessary to enforce the provision of the settlement agreement mandating that the external reviewers' decisions "*shall be final* and not subject to review" regardless of whether those decisions resulted from a process that complied with the settlement agreement. *Id*.:144, § 8.3c(2)(h)(iv)(G) (emphasis added).

The district court was plainly mistaken in holding that the arbitrator exceeded his authority by "honing in on" on the requirement that claims without a Review File must be *deemed approved* while supposedly overlooking the requirement that "decisions . . . by the External Reviewers must not be overturned" and *shall be final*. Dkt.6945:12. To the contrary, the arbitrator's final award echoed the prior rulings of both predecessor arbitrators which explicitly addressed—and explicitly rejected—the district court's conception of how the "deemed approved" and "shall be final" provisions were intended to operate in concert.

38

Specifically, all three arbitrators expressly harmonized those two provisions by resolving the parties' interpretive disputes about the Review File requirements— for instance, by providing authoritative definitions regarding what documents a Review File is required to contain; who was required to evaluate a Review File under certain circumstances; and how the procedure for processing a Review File was required to be carried out. Properly applying the definitions and instructions supplied by the arbitrator might lead some claims to be automatically "*deemed approved*" by operation of law without being subject to any exercise of discretion, and otherwise lead to substantive decisions which "*shall be final.*" *See, e.g.*, *Krakow v. Dept. of Professional Reg., Board of Chiropractic*, 586 So. 2d 1271, 1273 (Fla. 1st DCA 1991) (citing *World Bank v. Lewis*, 425 So. 2d 77, 79 (Fla. 1st DCA 1982)) ("Once … the application must be deemed approved," the board "was precluded from considering the merits of the … application"); *Tri-State Bancorporation, Inc. v. Board of Governors of Fed. Reserve Sys.*, 524 F.2d 562, 567 (CA7 1975) ("[I]t may well be a lesser evil as a matter of public policy for a non-meritorious application to be deemed approved by operation of law").[3]

---

[3] Resolving the parties' interpretive disputes relating to the procedures, definitions, and instructions for processing claims that were to be "deemed approved" did not require any of the arbitrators to review or overturn a substantive decision that "shall be final" in this case, but even a decision that "shall be final" could be subject to review in an appropriate case if it "proceeded upon a wrong interpretation of the contract." *Bowers Hydraulic Dredging Co. v. United States*, 41 Ct. Cl. 214, 223 (Ct. Cl. 1906); *accord Lepre v. Dept. of Labor*, 275 F.3d 59, 65 (CADC 2001) (citing

Specifically, the first arbitrator, Judge Davis, listed "a number of reasons" why he "disagree[d] with" the approach that was advanced by CIGNA in the arbitration and later adopted by the district court in its order vacating the arbitrator's final award. 12/22/09 Arbitral.Order:1. Judge Davis began by acknowledging that the "decisions of the [external reviewers] shall be final and not subject to review," and "agree[ing] that the" external reviewers "will make the final decisions on claims." *Id*. But, Judge Davis held, it was inherently within the arbitrator's authority to "adjudicat[e] the terms and conditions by which those decisions are made" to "ensure that the" external reviewers "make decisions in accordance" with the settlement agreement. *Id*:2. Expressly relying on the FAA's standards for "vacating … an otherwise final arbitration award," Judge Davis rejected CIGNA's (and now the district court's) argument that interpreting and enforcing the Review File requirement would impermissibly "revisit the final, non-reviewable decisions" of the external reviewers. *Id*.:1-2. (citing 9 U.S.C. § 10). To the contrary, as Judge Davis observed, CIGNA's (and now the district court's) position would render the

---

*Johnson v. Robison*, 415 U.S. 361 (1974)) ("[D]ecisions [that] shall be final" do not "foreclose judicial review of constitutional claims"); *Easley v. Hunter*, 209 F.2d 483, 486 (CA10 1953) ("[D]ecisions [that] shall be final and binding … do not deprive civil courts of … habeas corpus jurisdiction in proper cases"); *U.S. v. Haviland & Co.*, 167 F. 414, 419 (S.D.N.Y. 1909) ("[Decision] that … shall be final" can be "reviewed by the court, and impeached," if it "was not within the letter of the law").

settlement agreement effectively unenforceable and the arbitration "effectively meaningless." *Id*.:2

Following Judge Davis's death, CIGNA attempted to re-litigate this same issue before the successor arbitrator, Arbitrator Schultz, who similarly rejected it. Once again acknowledging that the decisions of the external reviewers "shall be final," Arbitrator Schultz reiterated that the parties appointed an arbitrator "to resolve 'all issues relating to' the compensability of certain claims," and "the claims procedure is determinative of and thus related to compensability." 11/29/12 Arbitral.Order:5-6. Accordingly, like Judge Davis before him, Arbitrator Schultz "disagree[d]" with CIGNA's argument, because accurate determinations" about the "compensability of certain claims … cannot be made if the parties" and external reviewers "do not comply with the processes as set forth in the Settlement Agreement." *Id*.

Finally, "[c]onsistent with these orders of Judge Davis and Arbitrator Schultz," Arbitrator Matthews underscored that the final award did "not review substantive decisions" made by any external reviewers, but rather "review[ed] the process" that they employed to ensure that they "followed the procedures dictated by the Settlement Agreement correctly." Final.Award:¶134. Thus, Arbitrator Matthews "exercise[d] restraint in the use of [his] powers" to interpret and enforce the settlement agreement by "correct[ing] certain specific deficiencies in the

procedure" for processing claims under the settlement agreement … without requiring a review of substantive decisions made by" the external reviewers. *Id*.:¶135; *accord id*.:¶240 ("This Award … determines the compensability of the claims [that] we denied due to a procedural flaw in the claim processing" procedure "that violated" the settlement agreement); *id*.:¶35 & Ex.B (quoting settlement agreement provisions).

"[T]hrough and through," these consecutive rulings by all three arbitrators reflect that they "considered" the terms of the settlement agreement "and decided whether it reflected an agreement to permit" enforcement of the procedures requiring certain claims to be "deemed approved" (as MCAG urged), or whether claims denied in violation of the settlement agreement's procedural requirements "shall be final" (as CIGNA urged). *Oxford*, 569 U.S. at 570. On one hand, the arbitrators agreed with CIGNA "the Settlement Agreement restricts [their] ability to reverse any substantive decision" by an external reviewer, which "shall be final" under the settlement agreement. Final.Award:¶131. "On the other hand," the arbitrator "and both predecessors" concluded that that they must "have the authority to review the procedures employed by the" external reviewers "to assure that they complied with the Settlement Agreement," including the requirement that claims lacking a Review File shall be "deemed approved [for] payment." *Id.*:¶133.

42

"Just by summarizing the arbitrator[s'] decisions," it "all but answer[s] th[e] question" that is determinative of this appeal. *Oxford*, 569 U.S. at 570. Clearly, the arbitrators were at least "'arguably construing'" the settlement agreement when "analyzing (whether correctly or not makes no difference) the scope of … what" the parties intended to allow the arbitrator to decide in his final award. *Id*. at 571. Accordingly, the district court's order "overturn[ing] his decision" necessarily found that that the arbitrator "misapprehended the parties' intent" about how to properly implement and enforce the disputed provisions of the settlement agreement. *Id.* But the FAA "bars that course" by "permit[ting] courts to vacate an arbitral decision only when the arbitrator strayed from his delegated task of interpreting a contract, not when he performed that task poorly." *Id*. at 572.

3.  *In Addition to Refusing to Defer to the Arbitrator, the District Court Also Misinterpreted the Claims-Payment Provisions of the Settlement Agreement*

For all these same reasons—plus one more—the district court similarly erred by concluding that the arbitrator exceeded his authority by "quantifying" the "monetary" value of the claims that were required to be paid under the settlement agreement. Dkt.6945:14.

**First**, as explained above, the parties and the district court authorized the arbitrator to render a "final resolution of all issues relating to whether the claims for [c]ompensation under the Settlement Agreement … are payable." *Managed Care*,

43

939 F.3d at 1163 n.7 (citing Arbitral.Agmt.:¶1). Accordingly, the arbitrator properly resolved the parties' divergent interpretations of the settlement agreement provisions relating to CIGNA's "obligation to provide 'Settlement Consideration' … consisting of its 'uncapped obligation to pay all Valid … Proofs of Claim'" submitted by the class members under the settlement agreement. Final.Award:¶¶115, 239-40; *accord* Dkt.2308:57-58, § 1.120 (defining "Settlement Consideration"); *id.*:121, § 8.3a (defining claims-payment obligations). The arbitrator "did what the parties had asked," which "suffices to show that the arbitrator did not 'exceed his powers,'" and the district court was required to defer to the arbitrator even if it would have construed those provisions of the settlement agreement differently in hindsight. *Oxford*, 569 U.S. at 570.

**Second**, as explained above, even if the district court were not required to defer to the arbitrator, its order vacating the final award was based on mistakes of fact and law about the scope of the arbitrator's authority to construe the claims-payment provisions under the settlement agreement.

In short, as the arbitrator explained before the district court impermissibly overruled him, "mak[ing] all decisions with regard to the compensability of" the class members' claims requires a two-step process under the settlement agreement: First, it is necessary to construe the *claims-processing* provisions to determine whether any class member claims were improperly denied for payment "due to a

44

procedural flaw" because the external reviewers failed to follow the protocol mandated by the settlement agreement. Final.Award:¶240. Second, it is necessary to construe the *claims-payment* provisions to determine whether CIGNA had fulfilled its obligation to replenish the Claim Distribution Fund with sufficient deposits "as necessary to pay Valid Proofs of Claim" as defined in the settlement agreement. *Id.*:¶239; *accord id.*:¶135 ("This Tribunal has received substantial competent evidence" permitting the final award "to correct certain specific deficiencies in the procedure" for processing claims "and to quantify their impact" for the payment of claims).

Indeed, the district court's conclusion that the arbitrator exceeded his authority in this respect is particularly dubious given that the parties only disputed the *validity* of the class members' claims, and did not dispute the *value* of any particular class member's claim. Accordingly, after resolving the parties' disputes over the proper operation of the claims-processing provisions of the settlement agreement, resolving the parties' disputes over the proper operation of the claims-payment provisions was nothing more than a ministerial task. *Jones v. Allen*, 2013 WL 494036, at *12 (S.D. Ohio Feb. 7, 2013) ("[A] 'deemed approved' provision that operates automatically and not as a matter of discretion"); *accord Tri-State*, 524 F.2d at 567 ("[A] non-meritorious application [may] be deemed approved by operation of law"); *Jebian v. Hewlett-Packard Co. Emp. Benefits Org.*

45

*Income Prot. Plan*, 349 F.3d 1098, 1103 (CA9 2003) ("[W]here … a claim is 'deemed denied' …, there is no opportunity for the exercise of discretion") (ellipses omitted); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 626, 631-32 (CA10 2003) ("[T]he … 'deemed denied' decision is by operation of law rather than the exercise of discretion"). Because the arbitrator did not "ignore the plain language" of the claims-payment provisions of the settlement agreement, but instead construed it in a manner that the district court disapproved in hindsight, the district court lacked a valid basis to vacate the final award under the FAA. *Spirit*, 2023 WL 2890013, at *3.

**Third**, the district court's determination that the arbitrator's final award "exceeds the contours of the Settlement Agreement" because it "allowed a monetary ruling" cannot withstand explicit text of the parties' written arbitration agreements. Dkt.6945:14.

In addition to generally permitting the arbitrator to arbitrator to "make all decisions with regard to the compensability of Category Two Claims now in arbitration," the parties specifically implemented a high-low arrangement detailing the parameters of the arbitrator's expected monetary ruling. Dkt.6677:¶4; Arbitral.Agmt.:¶1; Supp.Arbitral.Agmt.:¶5. "CIGNA agree[d] that it will pay MCAG $7.5 million" "in the event that the Arbitrator awards MCAG less than" that amount. Supp.Arbitral.Agmt.:¶2. MCAG, in turn, agreed "to seek an award no greater than $94 million from the Arbitrator," and to "accept $67 million as payment

in full" if the final award was greater than that amount. *Id.*:¶1. "This Agreement [wa]s the culmination of significant negotiations by the Parties," "each of whom was represented by counsel." Arbitral.Agmt.¶12; Supp.Arbitral.Agmt.:¶11. Because the parties and their counsel executed a written agreement that *required* the arbitrator to award a monetary ruling, it is inconceivable how the district court interpreted that same written agreement to somehow *prohibit* the arbitrator from issuing a monetary ruling.[4]

\* \* \*

Analyzing the district court's errors in construing the text of the settlement agreement risks missing the forest for the trees, because the district court and the arbitrator are not on equal footing when it comes to construing the same provisions of the same settlement agreement. The very exercise of construing the various provisions of the settlement agreement together as a whole represented the heartland of the arbitrator's delegated authority to reach a "final resolution of all issues" and to "make all decisions with regard to the compensability of" the claims submitted by the class members under the settlement agreement. Dkt.6677:¶4; *accord* Arbitral.Agmt.:¶1; Supp.Arbitral.Agmt.:¶5. The arbitrator interpreted and enforced

---

[4] Although the supplemental arbitration agreement was kept confidential from the initial arbitrator, the parties agreed to disclose it to each of his successors, including Arbitrator Matthews, who considered it in determining the scope of his authority to issue such a monetary award. Final.Award:¶¶4-5.

the settlement agreement as the parties and the district court directed him to do, which "suffices to show that the arbitrator did not 'exceed his powers.'" *Oxford*, 569 U.S. at 570 (brackets omitted).

**B.    The District Court Erred by Concluding that a Generic Release Provision in a Settlement Agreement Bars Enforcement of the Settlement Agreement**

The settlement agreement in this case—like virtually every settlement agreement in every case—contains a generic release provision that prohibits the class members from re-litigating any claims which "that have been or could have been asserted" against CIGNA, and "which arose prior to Final Approval" of the settlement agreement in February 2004. Dkt.6945:5 (citing Dkt.2308:55, § 1.108; Dkt.2900). It is baffling how the district court concluded that an arbitrator cannot enforce the terms of a settlement agreement without violating the generic release provision in the same settlement agreement. Dkt.6945:5-7.

At the risk of overstating the obvious, a generic backward-looking release provision in a settlement agreement does not prohibit a forward-looking petition to enforce the terms of the settlement agreement itself. "A settlement agreement is a contract and, as such, its construction and enforcement are governed by principles of Florida's general contract law." *Schwartz v. Fla. Board of Regents*, 807 F.2d 901, 905 (CA11 1987). And, under the plain language of the settlement agreement, the arbitrator's final award merely interpreted and enforced the procedures for

48

submitting, processing, and paying claims under a claims-based settlement agreement; it did not—and could not—re-litigate any causes of action which could have been asserted in the underlying litigation based on facts that arose before the final approval of the settlement agreement.

In addition to the unambiguous text of the release, which does not apply to bar enforcement of a settlement agreement based on acts that necessarily occurred after the final approval of the settlement agreement, the district court's interpretation would yield such destabilizing and "absurd result[s]" that it "should be avoided." *Philadelphia Am. Life Ins. Co. v. Buckles*, 350 F. App'x 376, 380 (CA11 2009). Essentially every settlement agreement includes a generic release provision similar to the one in this case. Thus, if the district court were correct that such a release removed any mechanism to enforce the terms of the settlement agreement itself, then most settlement agreements would be rendered "self-defeating." with troubling widespread implications. *Kostelac v. Allianz Glob. Corp. & Specialty AG*, 517 F. App'x 670, 677 (CA11 2013).

In short, every litigant in CIGNA's position would face an irresistible temptation to breach the settlement agreement without consequence, sparking an erosion of confidence that any settlement agreement could be enforced. These "perverse," "odd," "unfortunate and strange" consequences of the district court's interpretation of the release provision in the settlement agreement cannot stand.

49

*Abbott v. Perez*, 585 U.S. 579, 597-98 (2018). Rather, as other courts have explained in the face of similar allegations that a litigant did not "follow the agreed upon methodology" for processing and "calculating payment[s]" under a contract, that party "cannot then use the Release" in the contract "to bar … claim[s] that [it] did not adhere to its obligations under the same contract." *Ingham Reg. Med. Center v. United States*, 874 F.3d 1341, 1346 (Fed.Cir. 2017).

The district court failed to cite any binding legal authority supporting its erroneous ruling, and the cases it did cite actually bolster MCAG's point by juxtaposition. Dkt.6945:6 (citing cases). Unlike here, all of those cases involved affirmative causes of action that were barred by the generic release in the settlement agreement because they could have been asserted in the underlying lawsuit. None of those cases are similar to this case involving an alleged breach of the settlement agreement itself, which courts—and arbitrators—routinely adjudicate without hesitation. *See, e.g.*, *Paulucci v. Gen. Dynamics Corp.*, 842 So. 2d 797, 803 (Fla. 2003) ("[T]he court has the jurisdiction to enforce the terms of the settlement agreement even if the terms are outside the scope of the remedy sought in the original pleadings"); *Ill. Central R.R. Co. v. Byrd*, 44 So. 3d 943, 947 (Miss. 2010) ("[T]rial judges presented with motions to enforce settlement agreements customarily make findings of fact related to the … terms of the settlement agreements as necessary to rule on the motions to enforce settlement").

50

Indeed, at least one of the cases cited by the district court even bolsters MCAG's point more directly, as it highlights the determinative distinction that the district court disregarded. In *In re Managed* Care, this Court clarified that the generic release in the settlement agreement only bars the pursuit of claims when "all facts necessary to state a cause of action had occurred … before the Settlement Agreement took effect" and thus "constitute a continuation of the conspiracy alleged in" the underlying litigation. 756 F.3d 1222, 1236 (CA11 2014) (cited in Dkt.6945:6). Yet, this Court held, the "district court … incorrectly interpret[ed] the Settlement Agreement and thereby abused its discretion" by construing the generic release to bar claims that "could not have been asserted" in the underlying litigation, because the release does not "go so far as to release claims based on facts occurring after" the settlement agreement took effect. *Id*. at 1237-39 (cleaned up). Likewise, in an earlier interlocutory appeal in this same case, this Court underscored that the "district court retained jurisdiction 'as to all matters relating to the interpretation, administration and consummation of the Settlement Agreement." *Managed Care*, 939 F.3d at 1162. That holding necessarily implied that the arbitral proceedings necessary to interpret, administer, and consummate the settlement agreement— which were ongoing at the time of this Court's Opinion—were not occurring in contravention of the generic release. *Id*.

51

**C.**  **The District Erred by Finding that CIGNA Did Not Waive Its Arguments that the Arbitration Was Barred from the Outset**

After finding that the "Settlement Agreement's [generic] release bars the claims" in arbitration, the district court stated in a single conclusory sentence—without citing any precedent or portion of the record—that it did "not find sufficient record evidence that Cigna waived" this argument. Dkt.6945:1, 16. Even assuming that a generic release in a settlement agreement could prevent enforcement of the settlement agreement itself, the district's ruling that CIGNA somehow preserved this argument for the district court to decide is contrary to the nearly unbroken course of the arbitral proceedings that began in November 2005.

First, the arbitration was triggered when the parties disputed the definitions, terms, and procedures relating to the processing and payment of class members' claims under the settlement agreement. When one of MCAG's clients moved to "enforce[ ] the settlement" and "direct CIGNA to pay its claims" which had been "improperly process[ed]," it was CIGNA that approached MCAG to propose "binding arbitration of the matter" to resolve their disputes and "determin[e] whether … claims as provided in the Settlement Agreement were payable." *Managed Care*, 939 F.3d at 1152.

Because the FAA "reflect[s] both a 'liberal policy favoring arbitration,'" and "the 'fundamental principle that arbitration is a matter of contract,'" its "'principal purpose' … is to 'ensure that private arbitration agreements are enforced according

to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (citations and brackets omitted). And, because there is no question that a significant negotiation between these two sophisticated parties represented by expert counsel resulted in the voluntary referral of their dispute to a 15-year arbitration and final award, it was not appropriate for the district court to opine after-the-fact that a generic release in the settlement agreement subject to arbitration precluded "the arbitration [from] proceed[ing] in the first instance." Dkt.6948:1.

Second, CIGNA's conduct in the arbitration was incompatible with the preservation of any argument that "the claims were barred" from the outset. Dkt.6945:16. For instance, CIGNA recognized that the parties' disputes over how to correctly interpret, implement, and administer the settlement agreement's processing and payment terms that were the subject of the arbitration required it to make certain "concessions." *See, e.g.*, Dkt.4360:3-4, 21 & n.2. In fact, "during arbitration, CIGNA paid an additional $14 million … for distribution to the class members as required by the Settlement Agreement," which it had been withholding in contravention of the settlement agreement before the arbitration commenced. *Managed Care*, 939 F.3d 1152-53, 1163 n.7. In short, all of the parties, the district court, and this Court participated in an ongoing 15-year arbitration to "make all decisions" and "resol[ve] all issues relating to whether the" class members' claims "are payable pursuant to [the settlement] agreement." Dkt.6677:¶4; Arbitral.Agmt.:¶1. The district court's

holding that those claims were supposedly barred from the outset by a generic release provision in the settlement agreement is a dissonant change of tune.

Third, if CIGNA did not forfeit the release argument in the arbitration, that is only because the argument was raised, decided against CIGNA, and is now unreviewable in any event. At some times, CIGNA seemingly asked the arbitrator (as opposed to the district court) to decide whether it was "released … from any further liability" under the settlement agreement. CIGNA Arbitral.Aff.Defs.:7-8 (Aff.Def.Nos.7-9). And those affirmative defenses—including that "MCAG has no right to recovery of a monetary award" and that "CIGNA is entitled to credit for its prior payments"—were "accommodate[d]" and "adopt[ed]" within the arbitrator's final award. Final.Award:¶¶125-26. At other times, CIGNA seemingly insisted that the district court (as opposed to the arbitrator) was required to rule on whether it was released from liability under the settlement agreement. *Id.*:14 n.4 (recalling CIGNA's argument that "the district court cannot delegate [its] authority" to "enforce the Settlement Agreement's Release … to a non-Article III arbitrator"). In other words, CIGNA impermissibly hedged its bets, raising an "impressive[ly]" large number of "overlap[ping] arguments" in the district court and the arbitration, hoping to find at least one receptive audience in a heads-CIGNA-wins, tails-MCAG-loses scenario. *Id.*:¶30.

MCAG cannot predict which position CIGNA will adopt in this appeal but, as this Court and others hold, "procedural arguments" intertwined with the dispute in arbitration, such as whether a party "released all claims" in arbitration, "are for arbitrators, not courts, to decide." *Grigsby & Assocs., Inc. v. M Secs. Inv.*, 635 F. App'x 728, 732 n.9 (CA11 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002)), *abrogated on other grounds in Morgan v. Sundance, Inc.*, 142 S.Ct. 1708, 1712-13 (2022)); *accord Gen. Drivers, Salesmen & Warehousemen's Local Union No. 984 v. Malone & Hyde, Inc.*, 23 F.3d 1039, 1044-45 (CA6 1994) ("[C]onstruction of the release involves a question of the application of the CBA," and "requires examining the terms of the CBA itself," and thus "is properly left for arbitration"). Thus, either CIGNA "failed to raise the issue" of the release in the arbitration, in which case "the issue is forfeited"; or CIGNA did raise the issue in the arbitration, in which case the issue is precluded from further review because the final "award cannot be avoided solely on the ground that the arbitrator may have made an error of law or fact." *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (CA2 1998).

In sum, regardless of whether the district court's error stemmed from a misapplication of "waiver," "forfeiture," "laches," or any other "estoppel" concept—or whether CIGNA raised the issue with sufficient clarity to be resolved by the arbitrator—it was inappropriate to vacate the arbitrator's final award based

on an argument CIGNA waited far too long (15 years) before raising it in clear terms for the first time. *See Shipley v. Helping Hands Therapy*, 996 F.3d 1157, 1160 n.3 (CA11 2021) ("Waiver refers to the 'intentional relinquishment or abandonment of a known right,'" and "forfeiture refers to the 'failure to make the timely assertion of a right'"); *Marine Transp. Servs. Sea-Barge Group, Inc. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1138-39 (CA11 1994) ("Equitable estoppel 'is grounded on a notion of fair dealing and good conscience. It is designed to aid the law in the administration of justice where without its aid injustice might result").

**D.**  **The District Erred by Denying, as Moot, All Remaining Claims for Relief on Behalf of the Class Members**

Based on its erroneous determination that the arbitration was "barred by the Settlement Agreement's release" and "should not have proceeded in the first instance," the district court in turn denied, as moot, all of the remaining requests that MCAG sought on behalf of the class members. Dkt.6945:2; Dkt.6948:1. Because the district court's decision to deny these motions, as moot, was based on a flawed premise, the most appropriate course of action is to "remand for consideration of th[ese] motions on the merits." *Kilgo v. Ricks*, 983 F.2d 189, 190 (CA11 1993); *Imperato v. Navigators Ins. Co.*, 681 F. App'x 743, 745 n.1 (CA11 Feb. 28, 2017) ("Upon remand, the district court is free to reconsider [the] motion to dismiss that

was denied as moot"). But in an abundance of caution, MCAG briefly addresses those erroneous orders here.

First, because the district court improperly vacated the arbitrator's final award in its entirety, it improperly denied as moot MCAG's motion to confirm the final award with a modification, clarification, or correction of an apparent discrepancy in the arbitrator's ruling. Dkt.6945:2.

In short, MCAG's motion pointed out that, after finding that CIGNA failed to provide a Review File or "any documents at all for 129,891 claims," the arbitrator's final award concluded that only 81,450 of those claims should be "deemed approved [for] payment" as required under the terms of the settlement agreement, and also improperly reduced the prejudgment interest award. Apparently hoping "to avoid an outcome that he might have perceived as 'very harsh,'" the arbitrator imposed an impermissible "split-the-baby" compromise that contravened the "plain text" of the settlement agreement. Dkt.6821:24-35 (citing, *inter alia*, *Warrior v. Gulf Nav. Co. v. United Steelworkers of Am., AFL-CIO-CLC*, 996 F.2d 279, 281 (CA11 1993)).

Indeed, even CIGNA agreed that "the arbitrator [was not] correct in splitting the baby." 9/19/23 Hr'g.Tr.:57 ("THE COURT: So you both agree on that"). And, after vacating the final award, the district court also indicated on the record at a hearing that "the [arbitrator] split the baby in half, and I'm not sure you can do that."

12/12/23 Hr'g.Tr.:9. Accordingly, the district court should be permitted an opportunity to address MCAG's motion in the first instance on remand.

Second, "[i]n view of [its] finding that MCAG's claims are barred by the Settlement Agreement's release and the arbitration should not have proceeded in the first instance," the district court denied, as moot, MCAG's motion to enforce the settlement agreement by compelling the settlement administrator, EPIQ, to provide an "accounting … relevant as to MCAG's claims that proceeded to arbitration." Dkt.6948:1.

In short, the arbitrator found that one of the external reviewers—the settlement administrator, EPIQ—had not only failed to implement the claims-processing procedures required by the settlement agreement, but also persisted in a "game of 'cat and mouse'" to evade its obligation to provide a "Final Accounting" under the settlement agreement. Final.Award:¶198. As the arbitrator put it, EPIQ purportedly "completed what it characterizes as the Final Accounting," which "is not, in reality[,] a 'Final Accounting' under the Settlement Agreement." *Id.*:¶¶132 n.10 & 193. Indeed, both parties—albeit for different reasons—maintained that the Final Accounting was not complete, and the arbitrator deemed EPIQ's extraneous attempt to justify the obvious shortcomings as "nonsensical." *Id.*:¶¶192-97 (identifying "issues with the Final Accounting," and that EPIQ must "complete calculations required to finalize its Final Accounting").

Thus, to the extent that this Court determines that the district court's vacatur of the final award "was founded on an erroneous premise" and remands for further proceedings, the issue of the final accounting will not "ha[ve] rendered the controversy moot." *Jackson v. Ogilvie*, 426 F.2d 1333, 1337 (CA7 1970). Accordingly, the present appeal is solely intended to avoid an inadvertent waiver of any argument that the district court should consider this issue on the merits in light of the changed circumstances that would necessarily prevail on remand. *Pure Wafer Inc. v. City of Prescott*, 845 F.3d 962 (CA9 2017) (Smith, J., concurring in part and dissenting in part) ("[O]ur ruling today has removed the only basis on which the district court dismissed those [breach] claims"; "[t]herefore, the breach claims must be revived").[5]

---

[5] The district court's gratuitous alternative findings that it would have denied MCAG's motion even "if [it] was not mooted by the finding that the release barred MCAG's claims" are neither accurate nor preclusive on remand. Dkt.6948:1. In short, this Court has already underscored "the district court's ... responsibility, pursuant to Fed. R. Civ. P. 23, … to see that any settlement it approves is completed, and not merely … a promise to pay the relief to which [the] class members are entitled." *Managed Care*, 939 F.3d at 1162 (cleaned up); *accord Zients v. La Morte*, 459 F.2d 628, 630 (CA2 1972) ("[A] court supervising the distribution of a trust fund has the inherent power and duty to protect unnamed, but interested persons"). Consequently, it remains appropriate for the district court to consider in any further proceedings whether and how to enforce EPIQ's obligation to provide a final accounting, regardless of whether that request is made by MCAG, an individual class member, or *sua sponte* by the district court; and regardless of whether the authority to require a final accounting emanates from the settlement agreement or the district court's equitable inherent authority "to ensure the class members receive that to which they are entitled under the Settlement Agreement." *Managed Care*, 939 F.3d at 1162-63; *accord Henry v. Merrill Farms*, 94 F.R.D. 730, 733 (N.D. Cal. 1982)

## CONCLUSION

Appellant Managed Care Advisory Group, LLC respectfully requests that this Court reverse the district court's order granting CIGNA's motion to vacate the arbitrator's final award and remand for further proceedings. Dkt.6945.

Dated: March 29, 2024

<div style="margin-left: 40%;">

Respectfully Submitted,
**AXS LAW GROUP, PLLC**
2121 NW 2nd Ave, Suite 201
Wynwood, Florida 33127
Telephone: (305) 297-1878

By:    */s Jeffrey W. Gutchess*
Jeffrey W. Gutchess, Esq. (702641)
jeff@axslawgroup.com
Joshua A. Shore, Esq. (031894)
josh@axslawgroup.com
eservice@axslawgroup.com

*Counsel for Appellant*

</div>

---

("An accounting … detailing the disposition of claims made under the Stipulation of Settlement[ ] is necessary to assure that the stipulation is, in fact, implemented fairly and in accordance with its terms").

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,856 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word version 365 in 14-point font size and Times New Roman type style.

Dated: March 29, 2024

*/s Jeffrey W. Gutchess*
Jeffrey W. Gutchess
*Attorney for Appellant*

**CERTIFICATE OF SERVICE**

I certify that, on March 29 2024, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF, and is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

<div align="right">

_/s Jeffrey W. Gutchess_
Jeffrey W. Gutchess
_Attorney for Appellant_

</div>